# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2019 JUN 28  PM 4: 55

-----------------------------------------------------------------------X

Ben-Siyon Ish Yerushalayim;  &

Raizel Brasch-Yerushalayim;  &

Abraham Ḥayyim David Brasch-Yerushalayim;  &

(potentially) all similarly situated patients;

                                  Plaintiff(s),

   -against-

Dr. Mordechai Liechtung;  &

Milana (Dr. Liechtung's office manager in Avenue U Dental Arts)

Bridget (Dr. Liechtung's office manager in Manhattan Dental Arts)

John Doe/Jane Doe (not yet identified accomplices of Dr. Liechtung)

Dr. Tal J. Lebel;  &

Avenue U Dental Arts, Incorporated;  &

John Doe (a) an attorney representing Dentist Leichtung in the

  purported "acquisition" of Dentist Lebel's Brooklyn dental practice; and

John Doe (b) an attorney representing Dentist Tal J. Lebel in the purported

  "sale" of  Dentist Lebel's Brooklyn dental practice;

Mayor Bill de Blasio as ultimately responsible for all New York City policies and practices;

NYC Commissioner of Emergency Management Joseph Esposito as chief executive of 911;

Responding Police Officer A;

Responding Police Officer B;

EMS Technician Timur Chernichkin;

EMS Technician Vincent Mazzarella;

                                                        Defendants.

-----------------------------------------------------------------------X

Jury Trial Requested

# 19 CV 6202

1.      Federal jurisdiction in the instant matter is claimed because Plaintiff Ben-Siyon Ish Yerushalayim alleges violation of his Fourth Amendment right not to be seized or detained without due process and without probable cause. Moreover, Title 42 U.S. Code § 1983 makes state actors liable for violation of Constitutional rights and other rights and privileges. Federal jurisdiction is also claimed under Title 28 U.S. Code § 1331. Diversity of Citizenship exists because Defendant Dr. Tal J. Lebel is a citizen of the State of New Jersey, whereas all Plaintiffs herein are citizens of the State of New York. It is anticipated that damages and punitive damages will amount to at least seventy-five thousand dollars. See below concerning additional violations of state and federal laws.

Note: Just recently – after most of this complaint was already written by Plaintiff Ben-Siyon Ish Yerushalayim – an additional development came to the attention of your said Plaintiff on the 21st of December 2018, namely that in or about August of 2017, Dr. Mordechai Liechtung sold Avenue U Dental Arts. However, perusal of this complaint will reveal that our claims are still valid.

1a.     Defendant Dr. Mordechai Liechtung &
        Avenue U Dental Arts, Incorporated, (Care of Dr. M. Liechtung) &
        Attorney John Doe (a) (Care of Dr. M. Liechtung) &
        Milana (Care of Dr. M. Liechtung)
        Bridget (Care of Dr. M. Liechtung)
can each presumably be served legal process at Manhattan Dental Arts, 1995 Broadway, Suite 200, NY, NY. {This address is necessary because Plaintiff Ben-Siyon Yerushalayim was advised on the 21st of December 2018 by "Carmen" a receptionist or office manager of Avenue U Dental Arts that Avenue U Dental Arts has again changed ownership.}

1b.     Dr. Tal J. Lebel &
        Attorney John Doe (b) (Care of Dr. Tal J. Lebel)
can each be served legal process at 141 Terrace Street, Haworth, New Jersey 07641.

1c.     Defendant Mayor Bill de Blasio
can be served legal process at _____.

1d.     NYC Commissioner of Emergency Management Joseph Esposito
can be served legal process at _____.

1e.     Responding Police Officer A
can be served legal process at _____.

1f.     Responding Police Officer B
can be served legal process at _____.

1g.     EMS Technician Timur Chernichkin
can be served legal process at _____.

1h.     EMS Technician Vincent Mazzarella
can be served legal process at _____.

2. Dr. Tal J. Lebel joined the dental practice of his father Dr. Alex Lebel located at 1912 Avenue U in Brooklyn over a decade ago. At some point the dental practice became a public corporation under the name "Dental Land".

3. Approximately a decade ago Dr. Tal J. Lebel's father Dr. Alex Lebel retired from practicing dentistry due to physical infirmities.

4. In a fiduciary relationship, a person, in a position of vulnerability, justifiably vests confidence, good faith, reliance, and trust in another whose aid, advice or protection is sought in some matter. In such a relationship good conscience requires the fiduciary to act at all times for the sole benefit and interest of the one who trusts.

5. Plaintiffs Ben-Siyon Ish Yerushalayim, Raizel Brasch-Yerushalayim, and Abraham Hayyim David Brasch-Yerushalayim have been in a longstanding well-defined fiduciary relationship with Dr. Tal J. Lebel.

6. Since the 4th of November 2015, or thereabouts, Dr. Tal J. Lebel has been practicing dentistry for four days every week in a new practice he started (with another dentist as a partner) closer to his home on the other side of the Hudson River (in the state of New Jersey). Two days a week Dr. Tal J. Lebel continued to attend to his Brooklyn patients at 1912 Avenue U, in the dental clinic that was hitherto called "Dental Land" and was renamed Avenue U Dental Arts after being acquired by a dental clinic corporation in which Dr. Mordechai Liechtung is either the exclusive or principal owner.

7. Dr. Tal J. Lebel and Dr. Mordechai Liechtung, for personal and financial reasons, have entered into a contract which provides for the sale of Dental Land to Dr. Mordechai Liechtung.

8. However, the contract has provisions known to your Plaintiffs which are of dubious legality. Plaintiffs assert that those provisions are of dubious legality because they flagrantly violate aspects of the fiduciary relationship that has existed for many years between Plaintiffs and Dr. Tal J. Lebel.

8a. John Doe (a) an attorney representing Dentist Leichtung in the purported "acquisition" of Dentist Lebel's Brooklyn dental practice; and

John Doe (b) an attorney representing Dentist Tal J. Lebel in the purported "sale" of Dentist Lebel's Brooklyn dental practice, for their joint attempt to create a contract of sorts which disregards your Plaintiffs' rights pursuant to the dentist-patient fiduciary relationship which Dentist Tal J. Lebel has with each of his Brooklyn patients. The questionably-legal contract purports:

    (a) To legally enable Dr. Tal J. Lebel to claim that he is at liberty to gradually curtail or withhold even urgently needed dental care that Dr. Tal J. Lebel might otherwise have rendered to his Brooklyn clients (*i.e.* patients in a well-established fiduciary relationship with Dr. Tal J. Lebel) and

    (b) To permit Dr. Tal J. Lebel to ultimately totally abandon all his Brooklyn patients under the pretense that just as Dr. Tal J. Lebel can divest himself of his business interest in Dental Land's Avenue U dental office premises together with its dental/medical equipment, furnishings, and sundry appurtenances by conveying those things by means of some kind of "sale" to Dr. Mordechai Liechtung, so too is it being alleged that the "sale" enables Dr. Tal J. Lebel – who is not retiring from practicing

dentistry or even cutting back on the hours he devotes to the care of patients – to gradually "divest" himself of his fiduciary obligations to his Brooklyn dental patients" by "conveying" those patients to Dr. Mordechai Liechtung (despite the obvious conflict with ethical principles which flow from Dr. Tal J. Lebel's fiduciary obligations to his Brooklyn clients/patients);

9. Your Plaintiffs contend that whenever Dr. Lebel is unable to render necessary dental care in Brooklyn within a reasonable period of time due to the very limited time he now practices in Brooklyn, it is reasonable to insist that your Plaintiffs should have the option to receive dental care from Dr. Tal J. Lebel in Dr. Lebel's dental office on the other side of the Hudson River. However, according to the Brooklyn Avenue U office manager, Dr. Tal J. Lebel and Dr. Mordechai Liechtung stipulated in their contract that Dr. Lebel is absolutely not at liberty to accommodate his Brooklyn patients in New Jersey (regardless of any inability to render adequate care in Brooklyn).

10. Well prior to the sale of his Brooklyn based dental practice, Dr. Tal J. Lebel ascertained that Plaintiff Ben-Siyon Yerushalayim was in need of dental work on several molars so as to prevent deterioration and loss of those vital teeth.

11. At no time did Dr. Tal J. Lebel (or any other dental practitioner) find fault with either Plaintiff Ben-Siyon Ish Yerushalayim or Plaintiff Raizel Brasch-Yerushalayim or Abraham Hayyim David Brasch-Yerushalayim or attempt to exclude any one of your Plaintiffs in this action from his dental practice.

12. Although Plaintiffs have not yet retained legal counsel, injunctive relief is now being sought so that the named Plaintiffs – who have been loyal and long-standing dental patients of Dr. Tal J. Lebel – not continue to be deprived of the ministrations of Dr. Lebel due to the brutal and illicit actions of Dr. Mordechai Liechtung and several of his staff.

13. Additional injunctive relief is sought so that other patients not suffer wanton exposure to x-rays as did Plaintiff Ben-Siyon Ish Yerushalayim (as will presently be explained).

14. The three named Plaintiffs are amenable to having a Beth Din do fact finding and the drafting of a stipulation of settlement for consideration by the court, providing (a) all or some of the Defendants are amenable to such a venue, and (b) that the Beth Din adheres to established American civil case law dealing with abandonment of patients and do not insist that the parties pre-commit to a compromise, and (c) upon determining that the this suit has merit, all costs incurred including expenses for expert witnesses and the like be covered by the Defendants or by their liability insurance, and (d) that Defendant Dr. Tal J. Lebel attend to all needed dental remediation by Hanukah of the upcoming Jewish year, and (e) a formula for assessing damages and punitive damages be agreed upon by all parties and approved by the court..

15. The named Plaintiffs understand that they are not qualified to represent any class of similarly situated dental and medical patients, but they do pray that upon obtaining the services of an attorney deemed by the court to be competent to handle such a class action, class action certification be granted under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

16. It is the contention of the three named Plaintiffs that the pattern and practice of refusing to render dental care without prepayment for standard types of dental care and remediation not covered by insurance is so pervasive that many and perhaps most members of the public are not even aware that a dentist just like a physician is not at liberty to withhold care from a patient with

whom s/he has a fiduciary relationship, pending the completion of payment of a previous bill or pending pre-payment of part or all of the cost of the still needed care. Therefore withholding or unduly delaying needed dental care until pre-payment is received is a deceptive ploy engaged in by dentists which meets the three-pronged test for Deceptive Business Practices in Section 5(a) of the Federal Trade Commission Act (FTC Act) (Title 15 USC §45) which prohibits "unfair or deceptive acts or practices in or affecting commerce."

Here is a quotation from the Federal Trade Commission Act (Title 15 USC §45):

"An act or practice is deceptive where

• a representation, omission, or practice misleads

or is likely to mislead the consumer;

• a consumer's interpretation of the representation,

omission, or practice is considered reasonable

under the circumstances; and

• the misleading representation, omission, or practice is material.

17. Like most dentists, Dr. Tal J. Lebel has been inclined to insist on pre-payment of all dental work not covered by insurance.

18. Moreover, at no time did Dr. Tal J. Lebel or anyone else apprise Prof. Ben-Siyon Ish Yerushalayim that to wait for more than a few months before having his molars completely repaired would be risky.

19. Although Ben-Siyon Yerushalayim was sophisticated enough to realize that he probably could insist under doctrines of a dentist's fiduciary duty to his patient that the work not be put off pending pre-payment, he did not realize that he would not soon stop living in the "hand-to-mouth" mode in which he was living (due to his not receiving his pension from the City of New York [for which he worked for eleven years] and consequently would not accumulate the requisite amount of money to pre-pay for capping the molars needing to be capped).

20. Ultimately after the loss of two of the as-yet-uncapped molars and after suffering several abscesses, Ben-Siyon Ish Yerushalayim petitioned Drs. Lebel and Liechtung in writing (e-mails sent to the e-mail address of Dr. Tal J, Lebel) and likewise verbally explained to Dr. Liechtung why he must not obstruct Dr. Lebel from fulfilling his fiduciary obligation to complete the dental work still needed.

21. It is conceded that at some point in time, Dr. Tal J. Lebel did mention to Plaintiffs that he was opening a dental practice in New Jersey. However, despite the fact that Dr. Tal J. Lebel did continue to come to Brooklyn twice a week to provide some care for patients at the Brooklyn Avenue U dental practice, due to the fact that Dr. Tal J. Lebel was only spending one third as much time at the Brooklyn dental office as compared to the time he spent treating his Brooklyn patients previous to opening his New Jersey practice, Dr. Lebel's Brooklyn patients either had to acquiesce to be attended to by random dentists (who generally did not remain with the Avenue U dental office for very long) or else wait for as much as half a year to be seen by Dr. Tal J Lebel. In short Plaintiffs were not accorded consistent or adequate dental care. As a consequence Plaintiff Ben-Siyon Ish Yerushalayim lost at least one tooth due to it not being capped in a timely manner and moreover, suffered multiple abscesses due to Dr. Tal J. Lebel not being on top of matters.

22. As things stood right up to the 28th of June 2017 when Plaintiff Ben-Siyon finally had an appointment with Dr. Tal J. Lebel at the dental office on Avenue U in Brooklyn, Dr. Liechtung and his support staff were still obstructing Dr. Lebel from commencing the dental work that still needed to be done despite a written proposal by Plaintiff Ben-Siyon to make a two-hundred, fifty dollar pre-payment and pay an additional one-hundred, fifty dollars on the 3rd of each civil month until all dental work would be fully paid for. Even though Plaintiff Ben-Siyon had written a total of three times to Dr. Lebel no response was received. It came to light on the morning of the 28 June 2017 that contrary to the verbal assurances given to Plaintiff that his e-mails had been transmitted in hard-copy to Dr. Tal J. Lebel, the e-mails had actually been withheld from Dr. Lebel.

23. Although the relationship between Dr. Tal J Lebel and Dr. Mordechai Liechtung has never been adequately explained to Plaintiffs (and your Plaintiff's have even been denied copies of the written notification that was allegedly sent to [other] patients of Dr. Lebel) Plaintiff Ben-Siyon has gradually learned about a "contract" which purportedly attempts to define Dr. Tal's Brooklyn dental patients as some sort of commodity, which commodity is being "sold" or "conveyed" (against the will of some if not all of Dr. Tal's Brooklyn dental patients) to a dental practice corporation belonging to Dr. Mordechai Liechtung.

24. Dental practices are generally sold when a dentist retires or changes his profession. If a dentist merely elects to relocate to a near-by but more upscale locale (*i.e.* which locale is never-the-less still within traveling distance for his original Brooklyn patients) it is an evasion of that dentist's fiduciary duty to refuse to allow his original and still current patients to obtain dental care at the new location, especially when he cannot attend to their pressing dental needs in a timely manner in the limited time (in the instant case: two days a week) that he deigns to spend at his original (*i.e.* Brooklyn) location.

25. Another matter should be of grave concern to this court. Instead of according Plaintiff Ben-Siyon the care he so desperately needed, Dr. Liechtung's staff twice indulged in a deceptive charade in which a dentist and a technician actually assaulted and battered Plaintiff Ben-Siyon.

26. It is to the credit of Dr. Lebel that upon discovering the deception (the charade of pretending to seek pre-approval from Medicaid that Dr. Mordechai Liechtung's staff indulged in) Dr. Tal disassociated himself from the fraudulent and highly unethical and unlawful practice of subjecting patients to useless and uncalled for x-rays.

27. Dr. Tal J. Lebel belatedly took aside and pointed out to your Plaintiff Ben-Siyon Ish Yerushalayim that the Medicaid regulations make is clear that Medicaid does not pay for adult molars to be capped. Yet, not only has Ben-Siyon Ish Yerushalayim – a man of over seventy-four years of age – been kept in limbo for months on end in not one but two disingenuous "attempts" to obtain "Pre-Authorization" for Medicaid to pay for the capping of his molars (which authorization Dr. Liechtung and his staff knew all along would not be forthcoming from Medicaid) but Dr. Tal's revelation came too late to prevent Plaintiff from being duped into senselessly being exposed to numerous useless x-rays (dangerous ionizing radiation). Plaintiff Ben-Siyon Ish Yerushalayim now realizes that the sole purpose of the bogus "attempts" to obtain "Pre-Authorization" for Medicaid to pay for the capping of his molars was to create a façade that the new dental practice was doing all it could to "help" Plaintiff Ben-Siyon Ish Yerushalayim. {Note that it was for the

bogus "2nd attempt" to obtain "pre-approval" that totally useless x-rays images were created and sent to Medicaid. In other words, the useless x-rays were primarily made to further postpone or perhaps even to totally evade rendering legitimate dental care. It may actually be – and is indeed likely – that at the time the bogus x-rays were made, Dr. Liechtung was already in negotiations with the corporation that acquired Avenue U Dental Arts in or about August of that year.

28.     Bear in mind that current diagnostic x-rays were at the time either in the possession of the dental office or readily available from a nearby dental practitioner to whom Plaintiff had been referred by Avenue U Dental Arts for a consultation. Hence the x-ray images made under false pretenses were outright criminal in that they violated federal and state laws promulgated to protect people from being subjected unnecessarily to dangerous ionizing radiation. Therefore, without a doubt the dentist who ordered the non-justifiable x-rays was on two counts criminally remiss: (a) by willfully exposing a human being to multiple [*i.e.* eight (8)] exposures of totally unnecessary and useless ionizing radiation, and (b) by allowing herself to put aside professional and ethical principles simply to "accommodate" the wishes of Dr. Liechtung and/or his office manager in Avenue U Dental Arts to fraudulently dupe Plaintiff Ben-Siyon into agreeing to put off (put in abeyance) necessary dental work. {When the dentist who ordered the non-justifiable x-rays will be identified, that dentist's name will be entered into the roster of Defendants against whom this action is being brought.}

29.     There can be little doubt that illegitimately subjecting a patient to substantial ionizing radiation just to dupe that patient into believing that "the dental office is doing all it can" is flagrant malpractice and outright criminal misbehavior (assault and battery) under both state and federal law. Plaintiff Ben-Siyon Ish Yerushalayim is determined that other dental patients be protected from such dangerous, bogus dental practices. There can be no question that fraudulently subjecting dental patients to numerous such x-rays just to con them into believing that the dental office is "trying" to help, contravenes both federal and state laws prohibiting gratuitous and willful exposure of patients to totally unwarranted ionizing radiation.

30.     Moreover, Plaintiff Ben-Siyon Yerushalayim stresses that approximately a decade ago he obtained an explicit commitment from Dr. Tal J. Lebel that he would not defer needed treatment until collecting payment. Here is the story of how that came to pass: Soon after becoming a practicing dentist, Dr. Tal J. Lebel joined the hitherto solo practice of his then already elderly father Dr. Alex Lebel. When Dr. Alex Lebel decided to retire due to serious health problems, Dr. Tal J. Lebel approached his father's patients and appealed to each of them to become his patient. When Dr. Tal approached Plaintiff Ben-Siyon, Ben-Siyon explained that he had one serious reservation about agreeing to become his exclusive patient. Plaintiff Ben-Siyon explained that on one occasion Dr. Tal's father had urged him to try a new antibiotic which was not covered by his insurance. When Ben-Siyon agreed to allow Dr. Alex to administer the antibiotic, Dr. Alex insisted that Ben-Siyon get up from the dental chair to pay for the antibiotic before he Dr. Alex Lebel would proceed to administer dental care. Plaintiff attributed Dr. Alex's behavior to Dr. Alex's cultural background and realized that there was little he could do to change the behavior of a man so advanced in years (and therefore Ben-Siyon did not remonstrate with him). However, in-as-much as Dr. Tal had not practiced dentistry in the Soviet Union and was just starting out in his career, Plaintiff Ben-Siyon felt that he could influence his behavior. Therefore he explained to

Dr. Tal that although he did not remonstrate with his father, he really did regard his father's crude behavior as an affront.

31. Prof. Yerushalayim made it clear to Dr. Tal that unless he Dr. Tal would commit himself to being more trusting and not follow in his father's footsteps of invariably demanding pre-payment, he would not agree to leave his other dentist (Dr. Jeffrey Gamss). Dr. Tal J. Lebel agreed to Prof. Yerushalayim's terms. In exchange Prof. Yerushalayim agreed to stop patronizing Dr. Jeffery Gamss and committed himself to patronizing Dr. Tal J. Lebel for all his dental needs.

32. For the record Prof. Yerushalayim states that until recently he did not even realize that it has of late become more and more common for dentists to demand pre-payment for many things. Now that he has become aware of this all too frequent abridgment of fiduciary duty (*i.e.* that dentists are improperly postponing dental care until they have payment in hand for most things that are not covered by a patient's insurance), he and his co-plaintiffs are bringing this suit to judicially challenge the practice of refusing to proceed with many types of common dental care until pre-payment is received (even when the patient may be harmed thereby). While it might be legitimate when no fiduciary relationship yet exists, to refuse to treat a stranger in need of treatment – particularly when the practitioner does not hold himself out to be a provider of emergency treatment, it is well established in American jurisprudence that once a fiduciary relationship is established, inability to prepay for any part of a now conventional type of repair or replacement is not a valid reason to either withhold or unreasonably delay care. Obviously, no practitioner or facility can be required to accord unusual or very costly measures for which a patient cannot come up with payment under any reasonable payment plan, however, your Petitioners believe that American case law has established that conventional dental work which the patient will be able to pay for over a reasonable period of time must not be withheld or postponed merely because a client (*i.e.* a person with whom the dentist is in a fiduciary relationship) needs a not unreasonable number of months over which to remunerate the dentist. Therefore, Plaintiff Ben-Siyon Ish Yerushalayim seeks Declaratory Relief and prays that the Federal District Court either vindicate Petitioner's belief that inability to prepay for conventional types of dental work is not a valid reason for a dentist to withhold or unreasonably delay rendering any type of now conventional dental care or remediation (such as all types of "root canal" work and tooth capping), or alternatively – in the event the federal court system has not hitherto issued definitive holdings on such matters – that the federal appellate court system consider this issue and render a "holding" (Declaratory Relief) inasmuch as Federal Rule of Civil Procedure 11 alludes to the permissibility of presenting a non-frivolous argument for extending, modifying, or reversing existing law.

33. Let us also not forget that neglect of deteriorating teeth can even bring about a situation in which virulent bacteria migrate to a person's heart and cause untimely death, especially in elderly and other non-robust individuals.

34. Coming back to the complaint that it is not legitimate for Plaintiff Dr. Tal J. Lebel to "sell" patients with whom he has a long-standing fiduciary relationship, merely because he wishes to devote more time to his more lucrative "upscale" practice in nearby New Jersey where he is able to charge higher fees for services not covered by insurance. Your Petitioners contend that an

article written by two academicians in the Journal of the American College of Dentistry is germane to the instant matter. Here is the article's full bibliographical reference and abstract:

J Am Coll Dent. 2007 Summer;74(2):19-26:

Conflicts of interest: Is informed consent an appropriate mode, and disclosure an appropriate remedy?

Authors:  Parker LS,  Satkoske VB.

Center for Bioethics and Health Law at the University of Pittsburgh, USA. lisap@pitt.edu

Abstract:  Conflict of interest (COI) in dentistry is typically thought to arise when a dentist's exercise of professional judgment for the sake of a patient's interest is compromised by a secondary interest such as increase of reputation or financial gain. Disclosure of conflict of interest is often recommended as a remedy to prevent the erosion of the fiduciary relationship and to permit patients to take steps to protect their own interests. Borrowing the concept of a reasonable patient from discussions of disclosure standards for informed consent, this paper offers a patient-centered definition of COI: a COI exists when the presence of a dentist's secondary interest undermines the reasonableness of a reasonable patient's reliance on his or her dentist's professional judgment. It then argues that disclosure of COI (modeled on other disclosures during informed consent) is an inadequate remedy for the breach of ethics presented by COI and an inadequate strategy to prevent harms associated with Conflict Of Interest.  It also examines research indicating that disclosure of COI has perverse effects on the informed consent process and patient decision-making, so that disclosure of COI actually inhibits patients from taking steps to protect their own welfare.

35.  In light of the aforementioned ethical reasoning and analysis published for the edification of practicing dentists by Prof. Parker and Prof. Satkoske of the Center for Bioethics and Health Law at the University of Pittsburgh, the mere disclosure by Dr. Tal J. Lebel to his dental patients that he intended to "sell his Brooklyn dental practice" so as to reduce the time he would be spending in the dental practice his father opened in Brooklyn – and after a few years to totally abandon his Brooklyn patients – in order to devote his time to his new patients in his burgeoning New Jersey dental practice across the Hudson River (in an upscale area where he earn considerably more money), does not after all is said and done absolve Dr. Tal J. Lebel of his fiduciary duty not to abandon any established patient.  Rather, Plaintiff submits that even were Dr. Tal J. Lebel to insist that Plaintiffs made no objection when a number of years ago he spoke to them about his intention to sell his Brooklyn dental practice, curtailing services to Brooklyn patients is still a serious breach of ethics since after all is said and done Messrs. Parker and Satkoske have established that "a Conflict Of Interest exists when the presence of a dentist's secondary interest undermines the reasonableness of a reasonable patient's reliance on his or her dentist's professional judgment."

36.  In other words, even a candid disclosure of potential conflict of interest to one's clients does not absolve a dentist of his professional obligations under doctrines of fiduciary duty.

37.     Milana – Dr. Mordechai Liechtung's office manager in the Avenue U dental office – moreover informed Plaintiff Ben-Siyon that clauses in the contract between Dr. Tal J. Lebel and Dr. Mordechai Liechtung require Dr. Tal J. Lebel to refuse to serve his Brooklyn patients in his New Jersey office. While it might make sense for a dentist relocating from Brooklyn to a faraway place to reason that it is alright to pass patients to a different dentist, it is perverse to try to prevent

patients willing to travel to a reasonably nearby part of New Jersey – in order to continue to get acceptable and timely care from a fine dentist – from doing so.

38. The dentist-patient fiduciary relationship clearly trumps any such attempt to gain financially or otherwise at the expense of patients (especially patients such as the named Petitioners who have not been able to get timely appointments for needed dental repair with Dr. Lebel in Brooklyn due to Dr. Lebel having reduced his time in Brooklyn to one-third of the time he formerly was accustomed to spend doing dentistry in Brooklyn).

39. Dr. Tal J. Lebel strikes Plaintiff as an essentially upright and principled individual. It has occurred to Plaintiff Ben-Siyon Ish Yerushalayim that Dr. Tal J. Lebel may be "selling" the Brooklyn dental practice so as to provide his parents with a substantial sum of money (in all probability Dr. Alex Lebel did not receive any substantial money from his son when the son took over the dental practice). It is possible that Dr. Lebel, Junior, views himself as constrained to go along with Dr. Mordechai Liechtung's demands because he believes that he will not otherwise find a buyer for his father's dental practice. As previously stated, Dr. Alex Lebel was constrained to cease practicing dentistry due to physical infirmities. It is therefore quite likely that the proceeds from the sale of Dental Land are going to Dr. Alex Lebel, Dr. Tal J. Lebel's retired father. Never-the-less, your Plaintiff Ben-Siyon Ish Yerushalayim still contends that notions of fiduciary duty do dictate that Dr. Tal J. Lebel not abandon nor neglect his Brooklyn patients.

40. Returning to the matter of the unneeded x-rays:

Section 5(a) of the Federal Trade Commission Act (FTC Act) (15 USC §45) prohibits "unfair or deceptive acts or practices in or affecting commerce."

Deceptive Practices under Section 5(a) of the Federal Trade Commission Act stipulates:

"An act or practice is deceptive where

• a representation, omission, or practice misleads

or is likely to mislead the consumer;

• a consumer's interpretation of the representation,

omission, or practice is considered reasonable

under the circumstances; and

• the misleading representation, omission, or practice is material."

{While Plaintiffs may have no private right to seek damages under the Federal Trade Commission Act, Plaintiff Ben-Siyon Ish Yerushalayim maintains that it is germane to note that Dr. Mordechai Liechtung encourages his staff to indulge in practices that are reprehensible under multiple categories of criminal and/or civil misconduct, one of which is "deceptive practices" as defined by the Federal Trade Commission Act.}

41. The cruel and unconscionable charade of subjecting a dental patient to numerous x-rays for no other reason than keeping the patient at bay for months (and perhaps even generating in the process a bit of revenue for the dental office by obtaining payment from Medicaid for creating those bogus x-rays) by duping the patient into believing that the dental office is trying to obtain approval for capping one or more molars (although as Dr. Tal J. Lebel pointed out: the Medicaid regulations clearly state that Medicaid cannot be expected to pay any part of the costs of capping an adult's molar and the dental staff knows from experience that such appeals are useless

99 times out of a hundred), is without a doubt a deceptive practice that meets all the deceptive practice criteria of Section 5(a) of the Federal Trade Commission Act.

42. Moreover, subjecting a dental patient to numerous X-rays without any legitimate purpose whatsoever is a grave violation of medical ethics and likewise constitutes a heinous violation of the federal and state laws forbidding any illegitimate use upon humans of medical x-rays.

43. Allegations of this very treacherous and hence odious kind of battery are therefore likewise being leveled against Dr. Mordechai Liechtung and his staff.

44. On the 5th of March 2017, Plaintiff Ben-Siyon Ish Yerushalayim received an e-mail wishing him good wishes on his "birthday". The e-mail had as its e-mail source an e-mail address claiming to "belong" to Dr. Tal J. Lebel. The e-mail was also "signed" by Dr. Lebel. Plaintiff Ben-Siyon Ish Yerushalayim immediately responded with an e-mail demanding that Dr. Lebel attend to his serious dental needs which were being neglected.

45. Although Plaintiff Ben-Siyon Ish Yerushalayim called the site manager of the Avenue U dental office to verify that the e-mail was seen and would be transmitted to Dr. Tal J. Lebel (as well as Dr. Mordechai Liechtung), and the site manager did assure Plaintiff Ben-Siyon Ish Yerushalayim that both Dr. Lebel and Dr. Leichtung would receive copies of his e-mail, it ultimately came to light (on 28 June 2017) that neither that e-mail or subsequent e-mails were ever shared with Dr. Lebel.

46. Thinking that Dr. Leichtung was capable of being a reasonable man, Plaintiff Ben-Siyon Ish Yerushalayim made telephone contact already in March 2017 with Dr. Leichtung and attempted to explain to him that Dr. Lebel has a fiduciary obligation to attend to his the end of the telephone discussion he did agree to speak to his attorney to better understand the notion of fiduciary obligations.

47. At the end of that month of March 2017, Plaintiff again telephoned Dr. Leichtung to ascertain whether he had gotten a clarification from his attorney regarding a dentist's fiduciary duty to his patients. Plaintiff was gratified to hear from Dr. Leichtung that he had indeed discussed the matter with his attorney. Dr. Leichtung ended the telephone conversation with a verbal assurance that he would see to it that Dr. Tal J. Lebel would attend to Plaintiff's dental needs immediately after the eight day holiday of Passover.

48. Defendant Dr. Leichtung did not live up to his end of March 2017 verbal commitment.

49. The first appointment that was given to Plaintiff Ben-Siyon Ish was for 28 June 2017 (essentially a third of a year after the first e-mail complaint missive of 5 March 2017). Although Plaintiff protested in writing to Dr. Leichtung as well as to Dr. Tal J. Lebel that they were making a mockery of their ethical obligation to attend to their dental patient in a timely manner, matters did not improve. Plaintiff did not learn until the 28th of June 2017 that contrary to the assurances of Milana the site manager, Dr. Tal J. Lebel had not been given the e-mail missives addressed to him.

50. Although on the 28th of June 2017, Plaintiff Ben-Siyon Ish Yerushalayim was attended to relatively promptly by the dental hygienist, he wound up waiting hours for Dr. Tal J. Lebel to examine him. First Dr. Lebel told Plaintiff that he would be delayed because he (*i.e.* Dr. Tal J. Lebel) had that morning undergone some dental work which prevented him from eating breakfast and consequently he was asking that Plaintiff wait for him to take some nourishment. While

speaking briefly at that point to Dr. Tal J. Lebel, Plaintiff ascertained that Dr. Lebel had not received either of the two e-mails that he had sent to Dr. Tal E. Lebel's e-mail address.

51.  Plaintiff walked over to the reception area and informed Milana the site manager that from briefly speaking to Dr. Lebel, he has found out that contrary to the assurances given to him both by Bridget and her (Milana), Dr. Lebel had *not* been given either the first or second e-mail.

52.  Plaintiff then asked Milana to print out at least one of the e-mails for Dr. Lebel. Milana would not. Plaintiff is inclined to believe that his having discovered that Dr. Liechtung and his staff were withholding Plaintiff's missives regarding fiduciary duty from Dr. Lebel triggered the nastiness and brutality that Prof. Yerushalayim and his son experienced at the hands of Milana and her boss Mordechai Liechtung during the rest of that day 28 June 2017.

53.  The torment started with Milana sending numerous other dental patients to be attended to by Dr. Lebel before Plaintiff was summoned to be examined by Dr. Lebel.

54.  Thinking that her patient Ben-Siyon Ish Yerushalayim would momentarily be seen by Dr. Lebel, the dental hygienist had sent Plaintiff Ben-Siyon to a different treatment room (because she needed to free-up her room in order to attend to another patient) while he Plaintiff was still wearing a bib and protective goggles. However, another practitioner soon demanded that Plaintiff leave that treatment room because s/he needed the treatment room to work on another patient. It was suggested that Plaintiff sit in the waiting room until he would be sent in to be seen by Dr. Lebel. Plaintiff, still bedecked with bib and protective goggles, repaired to the waiting room where he met up with his son who had just arrived for the express purpose of watching over his father.

55.  Before long a clerical worker came over and announced that protective goggles could not be brought into the waiting room. Plaintiffs Ben-Siyon Ish Yerushalayim and Abraham Ḥayyim David Brasch-Yerushalayim then moved to an open area across from the treatment rooms where they waited for Plaintiff Ben-Siyon to be called to be examined by Dr. Lebel.

56.  Hours passed until Plaintiff was finally ensconced in mid-afternoon in a dental chair to be examined by Dr. Lebel.

57.  While Plaintiff Ben-Siyon was being examined by Dr. Tal J. Lebel, Milana the site manager brought two police officers to the door of the treatment room and asked Dr. Lebel to come out (without stating why).

58.  Initially Dr. Tal J. Lebel told Milana that he was engrossed in examining his patient and hence was not immediately available.

59.  Milana the site manager, however, demanded that Dr. Lebel immediate leave his patient and would not take no for an answer. Understandably, Dr. Tal J. Lebel was unwilling to risk having Dr. Liechtung abrogate the agreement to purchase the dental practice and so he left Plaintiff Ben-Siyon sitting in the dental chair and went into the hallway to comply with the site manager's strange demand.

60.  Plaintiff Ben-Siyon Ish Yerushalayim soon got up from the dental chair and joined Dr. Tal J. Lebel, the site manager, and the two police officers in the hallway.

61.  The police officers addressed Plaintiff Ben-Siyon and adamantly insisted that Plaintiff Ben-Siyon was trespassing in a place of business.

62. Plaintiff Ben-Siyon explained to the two officers that he was legitimately there by virtue of having come to a pre-scheduled appointment to have his teeth cleaned and likewise to be examined by his dentist Dr. Tal J. Lebel. Moreover, Plaintiff Ben-Siyon pointed out to the police officers that until Milana had in their presence demanded that Dr. Tal J. Lebel stop examining him and come out into the hallway, Dr. Tal J. Lebel had been engrossed in carefully examining him.

63. Moreover Dr. Tal J. Lebel did confirm at that point to the police precisely what Plaintiff Ben-Siyon alleged. Dr. Tal J. Lebel was, however, noticeably reluctant to be too supportive of Plaintiff lest Milana the site manager report to Dr. Leichtung that Dr. Tal was not "cooperating".

64. Despite Dr. Tal J. Lebel's confirmation that Plaintiff Ben-Siyon was legitimately receiving dental care that day and was not at all trespassing, the site manager pressed on with her demand that the police eject Plaintiff from the Avenue U dental office.

65. Dr. Liechtung was contacted by phone. Although Dr. Liechtung was eager to be rid of Plaintiff Ben-Siyon Ish Yerushalayim, Dr. Liechtung conceded that he had no grounds to have the police arrest Plaintiff Prof. Ben-Siyon Ish Yerushalayim and hence he informed the police that they were not to arrest Plaintiff Ben-Siyon Ish Yerushalayim. Nevertheless, Dr. Liechtung and Milana the site manager continued to obdurately demand that the police eject Plaintiff Ben-Siyon Ish Yerushalayim from the dental office.

66. So as to defuse the tension that Milana had unnecessarily caused, Plaintiff Ben-Siyon Ish Yerushalayim agreed to go out with the police providing he be allowed to speak to his dentist later that day. Dr. Lebel stated that he was amenable to that and Ben-Siyon and his son went out.

67. About forty-five minutes later Plaintiff Ben-Siyon Ish Yerushalayim and his son returned. Plaintiff Ben-Siyon stated that he had come to speak with his dentist Dr. Lebel as had been agreed earlier that day. Plaintiff Ben-Siyon further stated that inasmuch as Dr. Lebel might be busy with other patients, he and his son would be seated in the waiting room and would quietly wait to speak with Dr. Lebel. At that point there was some discussion concerning whether Plaintiff Ben-Siyon was duty-bound to limit his agreed-upon discussion with Dr. Tal J. Lebel to an after-hours telephone discussion. However, inasmuch as Plaintiff Ben-Siyon had succeeded earlier that day to have Milana's boss Dr. Liechtung concede that there was absolutely no grounds to allege that Plaintiff Ben-Siyon was trespassing or in any way disorderly or disruptive such that he might be legitimately arrested or even be obligated to leave the office, Plaintiff Ben-Siyon saw no reason to give in to further mistreatment.

68. Shortly after Plaintiffs were seated, in walked the two police officers who had previously been all too eager to gratuitously allege that Plaintiff had no legitimate business in the dental office. The police officers stated that they had seen the two of them re-enter the office and therefore they had returned. Apparently the police mistook Plaintiff Prof. Yerushalayim's willingness to temporarily leave the dental office to give Milana an opportunity to calm down and back-off from her unwarranted and unprofessional hostile behavior, as some sort of admission of wrongdoing. Based on that faulty belief – that when Plaintiff agreed to temporarily leave fifty minutes earlier, it somehow indicated that Plaintiff Ben-Siyon had somehow conceded that he really was not a legitimate patient with every right to receive care from his dentist. Although Plaintiff Ben-Siyon Ish Yerushalayim contended that there was nothing irregular about a dental patient returning to a dental office to speak with his dentist who had been in the midst of

ascertaining what dental work still needed to be completed when he had been abruptly interrupted, the police were unable to depart from a script that they appear to have been trained to follow, namely that "businesses" generate revenue for the city and therefore every 911 complaint must end with the "troublemaker" gotten rid of (even if that entails violating the Fourth Amendment not to seize a person without probable cause and due process).

69. Before long an ambulance arrived in front of the dental office and the New York City Police officers incorrectly claimed that Plaintiff Ben-Siyon Ish Yerushalayim had to allow himself to be taken to a hospital. Plaintiff Ben-Siyon Ish Yerushalayim and his son Abraham Ḥayyim David Brasch-Yerushalayim cooperated (so as not to give grounds for the police to allege "resisting arrest") and were taken to Maimonides Hospital.

70. Plaintiff Ben-Siyon Ish Yerushalayim eventually ascertained from the ambulance trip record filled out by one or both EMS technicians, that they had been prompted to write on the ambulance trip report that he was supposedly "delusional" because contrary to the professional opinion of Dr. Tal J. Lebel, Milana the office manager (or perhaps her employer) decided that "delusional" was a good pretext to use to get rid of a "wise guy" who did not like the way they "did business".

71. However, there was still the obligation to do things by the book. EMS technicians all know that despite being dispatched to take a "psychiatric" individual to a hospital, they are required to make an independent determination as to whether the person indeed needs to be taken to a hospital.

72. Plaintiff Prof. Ben-Siyon Ish Yerushalayim has contacted attorneys and executives in the New York State office that dictates EMS policy. He was informed that for EMS to certify an individual to work on an ambulance, the applicant must demonstrate that s/he knows that s/he is duty bound to make an independent determination that the person s/he and her partner are being called upon to take to a hospital, is really in need of being taken to a hospital. Generally when the ambulance "trip ticket" issued by 911 states "psychiatric" it is the duty of an EMS technician to ask a few simple questions of the individual to make a determination of whether the individual can legally be compelled to go to a hospital. In the old days (before the uproar that ensued when the public got wind that Stonybrook and other institutions that were being used to "house" severely retarded or mentally disabled individuals were not an optimal choice) orthodox doctrine allowed for the incarceration of a whole gamut "mental cases". Today public policy adheres to the opposite extreme. Except for the criminally insane and the like, unless a person – even a person with mental aberrations – is deemed likely to harm himself or others, he cannot be carted off to a hospital. Moreover, every ambulance EMS technician is required to carry forms for the use of an individual who might object to being taken to a hospital ER. However, not only do the EMS technicians fail to so much as talk to even a well-behaved person until he is locked into an ambulance, even then they do not endeavor to ascertain whether their prisoner seems to be a person who manifests signs that he might harm himself or others. Moreover, from multiple experiences that I have personally undergone at the hands of multiple EMS technicians, it appears quite probable that the EMS technicians believe that were they to make an honest assessment and discover that an individual really did not need to be taken to a hospital ER, they very likely would no longer be assigned to an ambulance and might even be put on a leave of absence without pay or at least never advance in their career. The sad fact is that now that the police can no longer get

away with making arbitrary arrests, carting "troublemakers" off to a hospital ER has become a popular ploy to take away *nudniks* and troublemakers to accommodate "businesses" that request that service. I have yet to see an EMS technician agree to let the "quarry" opt out of going to a hospital ER, yet every EMS technician supposedly carries forms for the use of an individual who might object to being taken to a hospital ER..

73. To reiterate, neither the police nor the EMS technicians followed any legitimate protocol or even engaged Plaintiff in conversation to make an independent assessment of the alleged need to cart off a "psychiatric" person to a local hospital ER. It is doubtful that the typical victim of s to whether before violating Plaintiff's Fourth Amendment right not to be seized without probable cause and due process.

74. It should be noted that before even being signed into the Maimonides ER or being examined for any delusional ideation, Plaintiff Ben-Siyon negotiated his release from Maimonides Medical Center. While the ER report uses the term "eloped" (perhaps to make it seem that Plaintiff had run away), in actuality upon arrival at the counter where the hospital staff takes charge of a patient from the ambulance EMS team who have brought it a "patient", Plaintiff Ben-Siyon demanded medication for his already diagnosed eye infection and was directed to speak with two Patient Relations personnel who were there. Without any objection from either of the EMS technicians who were still technically responsible until their "patient" would be signed over to the hospital staff, Plaintiff Ben-Siyon was told that he was at liberty to leave the hospital (without first being psychiatrically examined).

75. After experiencing a similar incident on the 16th of May 2018, Plaintiff Ben-Siyon Ish Yerushalayim contacted an attorney and others employed in the state administrative office of the New York State Emergency Medical Service. Plaintiff learned:
   a) The mere fact that someone – a police officer or anyone else – has contacted New York City's 911 and alleged that a "psychiatric" case needs to be taken to a hospital does not per se authorize ambulance personnel to cart someone off to a hospital.
   b) In order to cart off to a hospital any person who has not been declared by a police officer to be under arrest, EMS personnel must made an independent evaluation and determine that there is a likelihood that the person will either harm himself or harm others.

76. To reiterate for clarity: Upon arrival at the hospital – before he was registered – Plaintiff Ben-Siyon Ish Yerushalayim brought to the attention of the person attempting to register him that he urgently needed a certain antibiotic because he was suffering from an eye infection and did not have his antibiotic prescription with him. Plaintiff was told that it would take quite a while until the antibiotic could be given to him by the hospital, however, he was told to speak to a patient advocate who was present. The patient advocate suggested that he speak to another advocate of higher rank. Plaintiff Ben-Siyon Ish Yerushalayim did so and was told that if he wished he could leave the hospital. Plaintiff Ben-Siyon Ish Yerushalayim immediately opted to leave the hospital.

77. It should be noted that the ambulance attendant who was by law still responsible for Plaintiff Ben-Siyon Ish Yerushalayim because he had not yet been transferred into the care of Maimonides Medical Center ER did not object to her charge "eloping" without so much as being examined in any manner before leaving. Such indifference or passiveness on the part of EMS

technicians indeed demonstrates that the involvement of an ambulance and ambulance crew to "deal with" an "inconvenient" person has nothing to do with psychiatric or medical concerns, rather the involvement of the EMS ambulance crew is a ruse (a crafty stratagem, a subterfuge) to deal with an "inconvenient" person who is not violating any law.

78.   It appears from three unrelated instances of having ambulances called to cart Plaintiff Ben-Siyon Ish Yerushalayim away {9 March 2017; 28 June 2017; 16 May 2018} that New York City continues in its pattern and practice of seizing persons contrary to the provisions of Constitutional Amendment IV.

79.   There is a pattern and practice of unlawfully accommodating those operating businesses and even medical and dental offices who request that an "inconvenient" person be carted away to a hospital (*i.e.* when no legitimate medical reason is adduced to warrant the seizing of the person).

80.   In truth it is difficult to fault either the police or the EMS personnel; they are pawns doing as they are told by their superiors. Moreover it is unlikely that the majority of the responders are sophisticated enough to appreciate the niceties of American Constitutional law. Therefore they are not about to buck a system put in place by those who dictate New York City policy. Although the police officer who responded to the 9 March 2017 call to 911 from a NYU Medical clinic to have Plaintiff Ben-Siyon Ish Yerushalayim carted away as a "psychiatric" case, did stand up to the clinic manager and tell her that Plaintiff Ben-Siyon Ish Yerushalayim had every right – under HIPPA as well as under New York State law – to insist on a meeting with a clinic employee, at which meeting he and his wife could look over their medical records to ascertain what had been removed by their physician from the medical records. Nevertheless, despite the police officer's unwillingness to go along with the "psychiatric" ruse, the fact that an ambulance had been dispatched by 911 for a "psychiatric" case enabled or empowered the NYU Medical Center administration to posture that Plaintiff's presence in the clinic waiting room in Brooklyn constituted a threat to the safety of others (a letter alleging such was sent via Federal Express on the following day, the 10th of March 2017). However, on each of the other two occasions {28 June 2017 and 16 May 2018} not one of the police or EMS personnel departed from the illegitimate "psychiatric" charade/ruse. Hence it is fair to allege that many, and perhaps most responders – police and EMS personnel alike – are reluctant to object to the use of the ruse by any institution, entity, or "business".

## REASONS WHY A TIMELY SHOW CAUSE HEARING IS CALLED FOR

81.   Dr. Mordechai Liechtung and his staff have a penchant for wantonly exposing dental patients to unnecessary and uncalled for x-rays.

82.   A show Cause Hearing is sought to enjoin Dr. Mordechai Liechtung and those working for him to immediately desist from wantonly exposing patients to unnecessary and uncalled for x-rays.

83.   Plaintiffs pray that the court require Dr. Tal J. Lebel to testify at a Show Cause Hearing:
   (a) to confirm that Plaintiff Ben-Siyon Ish Yerushalayim was willfully and unnecessary exposed to the eight x-ray exposures shown on the attached page in

conjunction with a bogus applications made by Dr. Mordechai Liechtung's staff to Medicaid for "pre-authorization" for Medicaid to pay for the capping of his molars and

(b) to confirm the fact that all written communications from Ben-Siyon Ish Yerushalayim addressed to Dr. Lebel and requesting timely dental care and repair were never delivered to Dr. Lebel (contrary to assurances by Bridget and Milana the office managers to Ben-Siyon Ish Yerushalayim that each of his missives sent by e-mail had been forwarded not only to Dr. Mordechai Liechtung, but a copy of each had also been forwarded to Dr. Tal J. Lebel to whose e-mail the missives had been sent ).

84. So as not to interfere any more than absolutely necessary with Dr. Tal J. Lebel attending to his patients, Plaintiffs pray that Dr. Lebel be allowed to give his testimony over whatever type of audio and video two-way transmission may be available to Dr. Tal J. Lebel which might be acceptable to the court (for example: Scape).

85. A subpoena duces tecum is requested for copies of – and information concerning – all x-rays taken solely for alleged insurance pre-approval purposes, which x-rays are to be brought to the court on the date and at the time scheduled for the Show Cause Hearing by someone competent to describe the nature and intended purpose of those x-rays.

86. If the court contends that more evidence of an unconstitutional pattern and practice of dispatching ambulances manned by EMS personnel to seize and cart away non-threatening persons is in order before the court can issue a cease and desist order, let the court consider in camera the ambulance crew records and hospital diagnostic and treatment records for each ambulance dispatched under the rubric "psychiatric" over a specific number of months (such as eighteen months) so as to determine whether or not there appears to be an unconstitutional pattern and practice of seizing and carting off to local hospitals individuals who do not meet the criteria of likely to harm themselves or others.

## ADDITIONAL PRAYERS TO THE COURT

87. Plaintiffs pray that the Court assist Plaintiffs to obtain a copy of the written document that purports to stipulate the conditions of the transfer of "Dental Land P.C". to "Avenue U Dental Arts" so that the Court can determine whether the arraignment entailed a breach of Dr. Tal J. Lebel fiduciary obligations to his Brooklyn clients/patients in need of timely dental care. As explained above, your Plaintiffs contend that any interruption or slackening in the provision of the quality dental care reasonably expected from Dr. Tal J. Lebel is a violation of his fiduciary duty.

88. Plaintiff Ben-Siyon Ish Yerushalayim seeks eighteen thousand dollars ($18,000) in damages for the multiple infections experienced and the loss of two molars all due to the dental neglect by his dentist (a trusted dentist in a fiduciary relationship).

89. For unconscionable deception and consequent unlawful exposure to ionizing radiation by employees of Dr. Mordechai Liechtung, Plaintiff Ben-Siyon Ish Yerushalayim prays that the Court award him one-hundred thousand dollars ($150,000) damages, and an additional one-million, five hundred thousand dollars ($1,500.000) punitive damages.

90.     Employees of the City of New York (EMS technicians manning a New York City Fire Department ambulance) responding to a request made by either Dr. Mordechai Liechtung or his office manager Milana violated the Fourth Amendment to the Constitution of these United States of America by "seizing" Plaintiff Ben-Siyon Ish Yerushalayim and carting him off to Maimonides Medical Center without making any attempt to determine whether said Plaintiff could be regarded to be a person prone to harm either himself or others. Ever since New York courts have become more resolute in penalizing New York City for unjustified police arrests, New York City has been using the stratagem of sending ambulances out to seize anyone who is imaginatively labeled as "psychiatric". Ultimately the fees garnered by all parties participating in such ruses should be recouped and New York City must be dissuaded from utilizing ambulance crews to seize any person whose behavior does not call for a legitimate police arrest. Your Plaintiffs suggest to the Court that in the event New York City does not forthwith stipulate that it will cease and desist from the improper practice of allowing 911 personnel or any other city employees dispatch police officers and EMS crews to cart away unwanted persons who are not guilty of any crime or actionable misconduct and are not manifestly likely to be a danger to themselves or others, it might be necessary to temporarily incarcerate the policy makers responsible for such policies that violate Fourth Amendment rights as understood by our federal courts (but not yet acknowledged by New York State courts).

91.     Plaintiff also prays that the Court be mindful that Defendants Dr. Mordechai Liechtung and Milana acted in tandem with the municipal employees – two (2) police officers and two (2) EMS technicians – and as such should be penalized and likewise subjected to Declarative condemnation by the Court under the provisions of Title 42 U.S. Code § 1983 which makes all state actors (*i.e.* all persons who are not federal employees) "acting under color of law" liable for violation of Constitutional rights and other rights and privileges.

## Certification and Closing

92.     Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief, that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) is based on factual contentions which have evidentiary support or, if specifically so identified, will likely have evidentiary support after reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A     For Pro Se Parties**

I agree to provide the Clerk's Office with any changes to my current contact address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 5th day of March 2019

Signature of Plaintiff: _____ ציון איש ירושלים _____

Printed Name of Plaintiff:     Ben-Siyon Ish Yerushalayim